

FILED   ENTERED
LOGGED   RECEIVED

JAN 0 7 2026

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY                        DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## GREENBELT DIVISION

**JARED HESTER,**
Plaintiff,

     v.

Civil Action No. TDC 2 6 CV 0 0 0 5 8

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY (WMATA),**
**METRO TRANSIT POLICE DEPARTMENT,**
**OFFICER M. MILLHOUSE**, in his individual and official capacities,
**OFFICER V. TORRES**, in his individual and official capacities,
**JOHN/JANE DOE TRANSIT POLICE OFFICERS**, in their individual and official capacities,
**MONTGOMERY COUNTY, MARYLAND;**
**MONTGOMERY COUNTY DEPARTMENT OF CORRECTION AND REHABILITATION (DOCR/MCDC),**
**DIRECTOR BENJAMIN STEVENSON**, in his individual and official capacities,
**INVESTIGATOR DAVID HANAUER**, in his individual and official capacities,
**JENNIFER PABELLON**, in her individual and official capacities,
**JOHN/JANE DOE CORRECTIONAL OFFICERS**, in their individual and official capacities,
Defendants.

---

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF UNDER 42 U.S.C. § 1983 AND MARYLAND LAW

Plaintiff Jared Hester, proceeding pro se, alleges as follows:

## I.    INTRODUCTION

1. This is a civil rights and tort action arising from Plaintiff Jared Hester's unlawful arrest by Metro Transit Police officers over an alleged $2.25 bus fare and his subsequent detention under inhumane, discriminatory, and medically unsafe conditions at the Montgomery County Correctional Facility.

2. Plaintiff asserts claims under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, Articles 24 and 26 of the Maryland Declaration of Rights, and Maryland common law.

3. Plaintiff seeks compensatory and punitive damages, declaratory relief, and injunctive reforms to prevent similar abuse of other riders and detainees.

## II.    JURISDICTION AND VENUE

4. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

5. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367 because those claims arise from the same case or controversy as the federal claims.

6. Venue is proper in this District under 28 U.S.C. § 1391 because the events giving rise to this Complaint occurred in Montgomery County, Maryland, which is within this District.

## III.    THE PARTIES

7. Plaintiff Jared Hester ("Plaintiff") is an adult resident of Silver Spring, Maryland.

8. At all relevant times, Plaintiff was a paying customer and rider on the WMATA transit system and later a pretrial detainee in Montgomery County custody.

9. Defendant Washington Metropolitan Area Transit Authority ("WMATA") is an interstate compact entity that owns and operates the Metro system, including Metrobus, and employs or supervises Metro Transit Police Department officers.

10. Defendant Metro Transit Police Department ("MTPD") is WMATA's police force and is responsible for fare enforcement, arrest practices, and officer training and supervision.

11. Defendant Officer M. Millhouse was, at all relevant times, an MTPD officer acting under color of state law within the scope of his employment.

12. Defendant Officer V. Torres was, at all relevant times, an MTPD officer acting under color of state law within the scope of his employment.

13. Defendants John/Jane Doe Transit Police Officers are presently unidentified MTPD officers who participated in, approved, or failed to intervene in Plaintiff's unlawful arrest, use of excessive force, humiliation, and denial of medical care.

14. Defendant Montgomery County, Maryland, is a local government body that operates the Montgomery County Department of Correction and Rehabilitation.

15. Defendant Montgomery County Department of Correction and Rehabilitation ("DOCR" or "MCDC") operates the Montgomery County Correctional Facility, where Plaintiff was detained.

16. Defendant Director Benjamin Stevenson was, at all relevant times, the Director of DOCR, responsible for DOCR policies, training, investigation of complaints, and supervision of staff.

17. Defendant Investigator David Hanauer participated in the investigation and adjudication of Plaintiff's complaint regarding his treatment in DOCR custody.

18. Defendant Jennifer Pabellon is a DOCR employee who communicated with Plaintiff about his complaint and whose dismissive and hostile red-text email responses contributed to the denial of meaningful investigation and accountability.

19. Defendants John/Jane Doe Correctional Officers are presently unidentified DOCR/MCDC staff who participated in, caused, or failed to prevent Plaintiff's mistreatment, including unsafe classification, inhumane conditions, harassment, denial of medical care, and retaliation.

20. At all relevant times, each individual Defendant acted under color of state law and within the scope of his or her employment or agency.

IV.    **FACTUAL ALLEGATIONS**

A. The Bus Fare Encounter and Initial Contact with MTPD

21. On or about July 10, 2025, Plaintiff boarded a WMATA bus in Montgomery County, Maryland.

22. The bus fare at issue was approximately $2.25.

23. Plaintiff either had not yet completed payment or there was confusion regarding the fare payment. Plaintiff was willing and able to pay the fare.

24. MTPD officers boarded or confronted the bus to conduct fare enforcement.

25. Plaintiff offered to pay the fare and did not attempt to flee, conceal his identity, or act violently.

26. Instead of accepting payment or issuing a civil citation, the MTPD officers escalated the situation into a criminal arrest.

27. At least ten (10) officers were present in or around the bus area during the encounter, creating an intimidating and overwhelming environment for Plaintiff.

28. The officers' presence and demeanor communicated to Plaintiff and to the many passing onlookers that Plaintiff was considered a dangerous criminal, rather than a transit rider in a minor dispute.

29. Plaintiff spoke Spanish to another bus rider who was being ticketed for alleged non-payment, attempting to comfort her and explain the situation.

30. In response, one MTPD officer loudly laughed and cackled directly at and about Plaintiff for speaking Spanish, mocking him in front of other members of the MTPD and onlookers.

31. Plaintiff perceived this cackling as humiliating and racially charged, given his biracial background, his perception by the MTPD as white, and his ability to communicate in Spanish despite not being Hispanic or a native speaker of Spanish.

32. Plaintiff repeatedly told passers-by and onlookers that he was being arrested for a $2.25 bus fare, as multiple people walked by, observed the scene, made eye contact with Plaintiff, and appeared in shock or concern by his detention, or else appeared to judge Plaintiff for being a detainee.

33. Plaintiff felt intense humiliation as officers appeared to find the situation amusing rather than serious or professional.

**B. Escalation, Mocking, and Racialized Treatment**

34. Officer Millhouse called Plaintiff "mean" and antagonized Plaintiff, characterizing him in a negative light and addressing him in a personal way rather than professionally, maturely, and in a calm and controlled manner.

35. Officer Torres became personally offended and accusatory, claiming that Plaintiff had mocked his Hispanic heritage, which was not an accurate reflection of Plaintiff's statements or intentions.

36. Plaintiff, who is half-black and not fully white, used the word "nigga" in a conversational way in reference to himself or his experience, consistent with his own ethnic history and identity.

37. Officer Torres chose to include Plaintiff's use of that word in his written report, even though it was not necessary for describing the alleged fare violation or any relevant criminal conduct, and is not a criminal offense or an act contributing to Plaintiff's detention.

38. Plaintiff was concerned that the inclusion of this racially loaded term, taken out of context by DOCR staff members and detainees, would inflame hostility among DOCR staff and detainees, particularly given that the overwhelming majority of DOCR staff and detainees were Black Americans, people of African heritage or descent, and/or Spanish-speakers or people of Hispanic descent.

39. Plaintiff believes that MTPD weaponized his white racial presentation against him, mocking him for asserting that he is not white and treating him as if he had no right to identify as biracial.

40. Plaintiff observed that the mostly male and mostly straight-appearing officers treated a group of young, foreign female lifeguards who were also removed from the bus with markedly different behavior.

41. The lifeguards, who were young women in bathing suits, who were of Southeastern Asian appearance, and who spoke limited English, were spoken to slowly, kindly, and respectfully, with smiles and patient explanations.

42. Officers displayed what appeared to be their most courteous demeanor for these passengers, even while issuing fare-related tickets.

43. By contrast, Plaintiff was treated with hostility, sarcasm, ridicule, and aggression for a similar alleged fare issue. Therefore, Plaintiff reasonably believes he was denied comparable respect and courtesy because of his sex, perceived race, perceived sexuality, gender expression, and overall presentation.

44. On information and belief, on or about August 20, 2025, Officer M. Millhouse participated in a recorded interview with the news outlet Zeteo that was posted on YouTube.com ("YouTube"), in which he exhibited similarly dismissive and unprofessional attitudes toward members of the public press who questioned Metro Transit Police practices. Plaintiff will rely on this recording as further evidence of Officer Millhouse's pattern of covert hostility and lack of professionalism and proper representation of the Metro Transit Police Department, and as corroboration that the conduct Plaintiff experienced was consistent with broader customs and practices within MTPD and by Officer Millhouse in his individual and professional capacity.

### C. Arrest, Tight Handcuffs, and On-Scene Distress

45. Rather than resolving the matter through a warning or citation, the MTPD officers decided to arrest Plaintiff.

46. Plaintiff was placed in handcuffs that were applied excessively tightly.

47. Plaintiff immediately felt pain and pressure from the handcuffs and verbally complained to officers that the cuffs were too tight.

48. Plaintiff requested that the handcuffs be loosened or adjusted, but officers refused.

49. Over the course of the arrest and transport, the handcuffs left visible welts on Plaintiff's wrists.

50. Plaintiff later documented these welts with photographs.

51. Plaintiff began to experience acute distress during and after being handcuffed.

52. Plaintiff felt his heart racing, extreme fear for his life, and began visibly and audibly panicking and experiencing respiratory distress.

53. Plaintiff experienced shoulder pain due to overly tight handcuffs, chest tightness due to labored breathing, and a feeling of overwhelming panic due to the unprofessional, unskillful, and hostile behavior, attitude, and posture of the MTPD Officers Torres, Milhouse, and John/Jane Doe Officers.

54. Plaintiff started crying and screaming as his panic escalated into a full-blown panic attack.

55. Rather than interpreting this as a serious medical episode, officers treated Plaintiff's symptoms as misbehavior or a "public disturbance."

56. Plaintiff was ultimately charged, in part, based on his panic-driven screaming and distress, even though that distress was triggered by the officers' conduct.

### D. Denial and Discouragement of Medical Care

57. Plaintiff told officers he wanted to go to the hospital because he felt he was in a medical and psychological crisis.

58. Plaintiff informed officers that he needed his inhaler but Officer Torres refused to administer it, or take Plaintiff out of handcuffs to administer it to himself.

59. Plaintiff informed officers he had a diagnosis of PTSD given to him by a registered medical professional, was in distress, and needed his PTSD medication, his inhaler, and/or medical attention.

60. Plaintiff's breathing difficulties, shaking, and hyperventilation were obvious to those around him.

61. Rather than arranging transport to the hospital, at least one officer told Plaintiff that if he chose to go to the hospital, his detention process would be much longer.

62. The officer suggested that if Plaintiff declined hospital care, he would only be at the detention facility for "a couple of hours" before being released.

63. This statement was misleading and implied that seeking medical treatment would be punished with longer confinement.

64. Relying on the officer's representation, and already overwhelmed, Plaintiff reluctantly forewent an immediate hospital visit.

65. In reality, Plaintiff would spend approximately fourteen to fifteen (14–15) hours in custody before seeing a commissioner and being released.

66. Plaintiff later learned that other detainees who arrived after him were sent out sooner and spent significantly less time in the holding area.

67. Plaintiff's request for medical care and his obvious symptoms were not reasonably addressed by MTPD.

### E. Transport to MCDC and Classification as "Level 5 Danger"

68. Plaintiff was transported to the Montgomery County Correctional Facility (MCDC), operated by DOCR.

69. Upon arrival, Plaintiff underwent a screening process that included a safety questionnaire regarding LGBT identity, past experience with sexual trauma, past arrests, height, age, and other risk factors for physical assault or sexual assault while detained.

70. Plaintiff's responses resulted in his being assigned a danger or risk score of six (6) out of nine (9), which is a high score representing a high risk for Plaintiff.

71. Plaintiff believes that this score did not reflect his true level of risk towards others, particularly given that his underlying matter involved only a bus fare dispute, but rather his risk of experiencing physical and/or sexual assault while detained.

72. Despite the high score, DOCR staff did not use this information to protect Plaintiff from harm or place him in a safer environment.

73. Instead, the score was effectively ignored by DOCR and/or MCDC staff members when Plaintiff raised concerns about his placement in the holding cell to two separate DOCR and/or MCDC staff members separately.

74. When Plaintiff expressed fear about being housed in the crowded holding cell given his mental health and the screening results, he was told that his concerns were irrelevant.

### F. Filthy, Overcrowded Holding Cell and Inhumane Conditions

75. Plaintiff was placed in an overcrowded holding cell.

76. The cell was visibly filthy and unsanitary.

77. Plaintiff observed, and later reported, that the cell contained smears or stains of feces, blood, and vomit.

78. The floor and surfaces did not appear cleaned or disinfected.

79. Plaintiff did not receive a blanket or any hygienic accommodations.

80. There was no clean, comfortable place to sit or rest.

81. The temperature was uncomfortably cold, Plaintiff wore only a short-sleeve top, Plaintiff had the attached string of his sweatpants cut but was not offered a jumpsuit to wear that would have covered his whole body, and Plaintiff remained thirsty and physically depleted.

82. Plaintiff was forced to remain in this environment for 14 to 15 hours.

83. Several other detainees in the cell appeared to be intoxicated or high.

84. While the other detainees were not overtly aggressive toward Plaintiff, their condition and the environment heightened Plaintiff's sense of vulnerability and fear.

85. Plaintiff had legitimate concerns for his safety given the combination of overcrowding, contamination, and impaired detainees.

86. DOCR staff did not meaningfully address these risks or provide Plaintiff with safer housing.

### G. Harassment, Mocking, and "You're Not Here to Sleep"

87. While in DOCR custody, Plaintiff was verbally mistreated by staff.

88. When Plaintiff requested relief from the conditions, whether by being moved, given sanitary accommodations, or allowed to rest, he was told by one correctional officer, with cruelty and intimidation, "You are not here to sleep."

89. This statement communicated deliberate disregard for Plaintiff's basic human needs.

90. DOCR staff mocked Plaintiff when he expressed that he is not white and referenced his biracial identity.

91. Plaintiff reasonably perceived this as racial harassment and an attempt to delegitimize his identity.

92. Plaintiff, who is gay and gender non-conforming, and often perceived as such, also experienced or perceived hostility related to his sexual orientation due to the friendlier treatment received by other detainees from DOCR and/or MCDC staff.

93. DOCR staff treated Plaintiff's distress and identity as a source of ridicule rather than a basis for care.

94. Plaintiff was not given meaningful access to mental health support or reassurance despite being visibly upset.

95. The mocking, derisive tone deepened Plaintiff's sense of humiliation and fear.

### H. Denial of Medication and Continued Medical Distress

96. While detained at the bus stop, Plaintiff informed MTPD officers that he needed his inhaler and that he had PTSD.

97. Plaintiff continued to experience anxiety, hyperventilation, and other panic symptoms.

98. A medical team eventually came to look at Plaintiff, but there was no adequate or sustained medical intervention.

99. Plaintiff was not provided with his inhaler when he needed it.

100. Plaintiff was not provided with any medication to help manage his panic or PTSD symptoms.

101. MTPD officers saw Plaintiff crying, shaking, and in visible distress.

102. Despite this, officers continued to treat Plaintiff's condition as a nuisance or behavior problem rather than a serious medical and mental health need.

103. Plaintiff's panic and distress were later exacerbated by lack of sleep, the filthy environment, and prolonged uncertainty about when he would see a commissioner while at the MCDC and/or DOCR detention facility.

### I. Unequal Release Timing and Prolonged Confinement

104. Plaintiff ultimately remained in custody for approximately fourteen to fifteen (14–15) hours.

105. During this period, Plaintiff saw people who had been brought in after him receive faster processing and earlier release.

106. Plaintiff reasonably believed that he was being made to wait longer as a form of punishment or disregard, especially due to the benign and abnormally minor nature of his bus fare evasion charge, which was also mentioned by detainees to Plaintiff.

107. Plaintiff's prolonged confinement extended his exposure to the inhumane conditions of the holding cell.

108. Plaintiff's mental health deteriorated over the course of the night and into the next day.

109. When Plaintiff finally saw a commissioner, his presence in custody was based on a minor fare-related issue and emotionally driven charges arising from his panic, which seemed shocking to other detainees.

110. Eventually, criminal charges against Plaintiff arising from this incident were dismissed via nolle prosequi.

### J. Lasting Harm and PTSD Exacerbation

111. Plaintiff has been diagnosed with PTSD as of June 2024 by a board licensed psychiatrist.

112. The events of July 10–11, 2025, significantly exacerbated his PTSD symptoms.

113. Plaintiff continues to experience flashbacks, anxiety, intrusive thoughts, suicidal ideation, and heightened fear when encountering police, correctional settings, or even public transit.

114. The mocking he endured for his race, language, and sexuality caused enduring emotional harm and broke trust with law enforcement.

115. The experience of hyperventilating, pleading for medical care, and being ignored has made Plaintiff more fearful of seeking help in future emergencies.

116. Plaintiff remains deeply disturbed by the contrast between the respectful treatment given to young female lifeguards and the hostility he endured regarding the same circumstance.

117. Plaintiff continues to suffer ongoing emotional and psychological harm as a direct result of Defendants' actions.

### K. DOCR Investigation, Hanauer, Stevenson, and Pabellon

118. After his release, Plaintiff filed a complaint regarding his treatment at MCDC and DOCR.

119. Plaintiff provided detailed accounts of the filthy holding cell, harassment, denial of medical care, and prolonged confinement.

120. Defendant Investigator David Hanauer participated in reviewing Plaintiff's complaint.

121. Defendant Director Benjamin Stevenson received Plaintiff's communications and was responsible for the overall handling and outcome of DOCR's internal response.

122. Defendant Jennifer Pabellon communicated with Plaintiff by email regarding the complaint investigation.

123. In at least one email, Pabellon responded to Plaintiff in red text, using a tone that was dismissive, hostile, and unprofessional.

124. Pabellon's red-text response conveyed irritation and disdain rather than neutral, respectful communication.

125. Plaintiff reasonably interpreted Pabellon's tone and formatting as signaling that his complaint was unwelcome and that DOCR was not approaching his concerns with good faith.

126. Rather than acknowledging the seriousness of Plaintiff's allegations about inhumane conditions and harassment, DOCR's written responses minimized or rejected them.

127. In written findings or investigation summaries, Hanauer and/or Stevenson inaccurately characterized Plaintiff's allegations and/or failed to fairly assess the evidence.

128. The response to Plaintiff's complaint suggested an institutional interest in exonerating DOCR staff rather than uncovering the truth.

129. Plaintiff's detailed description of feces, blood, vomit, overcrowding, and mocking were not meaningfully refuted or addressed with remedial measures.

130. Instead, DOCR's internal response, including communications from Pabellon, left Plaintiff feeling further invalidated and retraumatized.

131. Through their actions and omissions, Stevenson, Hanauer, and Pabellon contributed to an ongoing pattern of deliberate indifference to detainee rights within DOCR.

## V. CLAIMS FOR RELIEF

### COUNT I – UNLAWFUL SEIZURE / FALSE ARREST
**(Fourth Amendment, 42 U.S.C. § 1983)**
**Against WMATA, MTPD, Millhouse, Torres, and John/Jane Doe Transit Officers**

132. Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

133. Defendants lacked probable cause or reasonable suspicion to effect a custodial arrest over a minor bus fare dispute, particularly where Plaintiff offered to pay.

134. The decision to arrest Plaintiff, rather than issue a citation or warning, was unreasonable and violated the Fourth Amendment.

135. As a direct and proximate result, Plaintiff suffered loss of liberty, emotional distress, and other damages.

### COUNT II – EXCESSIVE FORCE
**(Fourth Amendment, 42 U.S.C. § 1983)**
**Against WMATA, MTPD, Millhouse, Torres, and John/Jane Doe Transit Officers**

136. Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

137. Defendants applied handcuffs excessively tightly, ignored Plaintiff's complaints of pain, and left him with visible welts.

138. Defendants escalated rather than de-escalated Plaintiff's panic and distress.

139. The force used was objectively unreasonable under the circumstances and violated the Fourth Amendment.

140. Plaintiff suffered physical pain, injury, and emotional trauma as a result.

### COUNT III – MALICIOUS PROSECUTION / ABUSE OF PROCESS
### (Fourth and Fourteenth Amendments, 42 U.S.C. § 1983)
### Against WMATA, MTPD, Millhouse, Torres, and John/Jane Doe Transit Officers

141. Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

142. Defendants pursued criminal charges related to a minor fare issue and Plaintiff's panic-driven distress despite lacking a proper factual and legal basis.

143. Defendants included inflammatory, unnecessary racial language in reports to portray Plaintiff negatively.

144. Criminal charges were ultimately dismissed via nolle prosequi in Plaintiff's favor.

145. Defendants' actions caused Plaintiff to suffer anxiety, reputational harm, and emotional distress.

### COUNT IV – EQUAL PROTECTION – DISCRIMINATORY TREATMENT

### (Fourteenth Amendment, 42 U.S.C. § 1983)

### Against WMATA, MTPD, DOCR, Montgomery County, and Individual Defendants

146. Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

147. Plaintiff is a biracial, half white, half black, gay, gender non-conforming, non-binary male with PTSD.

148. Defendants treated Plaintiff differently than similarly situated individuals, including the young female foreign lifeguards wearing bathing suits, who were treated kindly and respectfully for similar alleged fare issues.

149. MTPD officers mocked Plaintiff for speaking Spanish and for identifying as non-white.

150. DOCR staff mocked Plaintiff's identity and complaints rather than taking them seriously.

151. Plaintiff's race, perceived sexuality, and presentation were factors in Defendants' hostility and differential treatment.

152. Defendants' actions violated the Equal Protection Clause of the Fourteenth Amendment.

### COUNT V – DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

### (Fourteenth Amendment, 42 U.S.C. § 1983)

### Against MTPD, DOCR, Montgomery County, and Individual Defendants

153. Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

154. Plaintiff experienced a serious medical and psychological episode, including hyperventilation, panic attack, breathing difficulty, and PTSD exacerbation.

155. Plaintiff requested hospital care and his inhaler and reported that he had PTSD.

156. Defendants discouraged Plaintiff from seeking hospital care by falsely suggesting it would prolong his detention.

157. DOCR staff saw Plaintiff's ongoing distress and did not provide adequate medical intervention.

158. Defendants' deliberate indifference violated Plaintiff's Fourteenth Amendment rights and caused Plaintiff harm.

### COUNT VI – UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT
### (Fourteenth Amendment, 42 U.S.C. § 1983)
### Against DOCR, Montgomery County, Stevenson, Pabellon, Hanauer, and John/Jane Doe Correctional Officers

159. Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

160. Plaintiff was held in a filthy, overcrowded holding cell contaminated with feces, blood, and vomit.

161. Plaintiff was denied clean accommodations, adequate hygiene, and a safe place to rest.

162. Staff mocked Plaintiff and told him he was not there to sleep, disregarding basic human needs.

163. Defendants' actions and policies caused Plaintiff to endure unconstitutional conditions of confinement in violation of the Fourteenth Amendment.

### COUNT VII – § 1983 MUNICIPAL LIABILITY (MONELL) Against WMATA and Montgomery County

164. Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

165. The violations of Plaintiff's rights were caused by policies, customs, or practices of WMATA and Montgomery County, including but not limited to:

a. Tolerating or encouraging unnecessary arrests over minor fare disputes;

b. Failing to train on de-escalation and mental health crises;

c. Failing to maintain safe, sanitary detention conditions;

d. Failing to investigate detainee complaints in good faith or with meaningful accountability.

166. These policies, customs, and failures were the moving force behind the constitutional violations Plaintiff suffered.

167. Plaintiff suffered damages as a result.

### COUNT VIII – FALSE IMPRISONMENT
### (Maryland Common Law)
### Against WMATA, MTPD, Montgomery County, and DOCR

168. Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

169. Defendants intentionally confined Plaintiff without legal justification.

170. Plaintiff did not consent to this confinement.

171. Plaintiff suffered harm as a result.

### COUNT IX – NEGLIGENCE / GROSS NEGLIGENCE (Maryland Common Law)
### Against All Defendants

172. Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

173. Defendants owed Plaintiff a duty of care as a transit rider and detainee.

174. Defendants breached that duty by failing to act as reasonably prudent officers and staff under the circumstances.

175. Defendants' negligence and gross negligence caused Plaintiff's physical, emotional, and psychological injuries.

### COUNT X – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Maryland Common Law)
### Against All Individual Defendants

176. Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

177. Defendants' mocking, racialized, and humiliating conduct was extreme and outrageous.

178. Defendants knew or should have known that their conduct would cause severe emotional distress.

179. Plaintiff suffered severe emotional distress as a direct result.

### COUNT XI – ASSAULT AND BATTERY
### (Maryland Common Law)
### Against Millhouse, Torres, and John/Jane Doe Transit Officers

180. Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

181. Defendants placed Plaintiff in apprehension of imminent harmful or offensive contact and then committed harmful or offensive contact by applying overly tight handcuffs and ignoring his complaints.

182. Plaintiff sustained physical and emotional injury as a result.

### VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

    A.  Enter judgment in favor of Plaintiff and against all Defendants;

    B.  Declare that Defendants violated Plaintiff's rights under the United States Constitution, the Maryland Declaration of Rights, and Maryland law;

    C.  Award compensatory damages in an amount to be determined at trial;

D.  Award punitive damages against the individual Defendants in an amount to be
    determined at trial;

E.  Order injunctive relief, including but not limited to:

    a.  Training requirements for MTPD officers on de-escalation, mental health,
        and bias-free policing;

    b.  Training and policy reforms for DOCR staff regarding detainee medical
        needs, LGBTQ+ respect, and nondiscriminatory treatment;

    c.  Sanitation and oversight reforms in the Montgomery County Correctional
        Facility;

    d.  Improved, good-faith complaint investigation procedures within DOCR;

F.  Award Plaintiff his costs and any available fees under 42 U.S.C. § 1988 (if later
    represented by counsel); and

G.  Grant such other and further relief as the Court deems just and proper.

**VII. JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Jared Hester Jared Hester

1200 East West Highway, Apt. 205 Silver Spring, MD 20910

Phone: 240-353-8821

Email: jrdhester@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this ___6___ day of ___January___, ___2026___, a copy of the foregoing Complaint was mailed, postage prepaid, by the Court to:

Office of General Counsel

Washington Metropolitan Area Transit Authority (WMATA) 600 Fifth Street, NW Washington, DC 20001

Officer M. Millhouse and Officer V. Torres c/o WMATA Office of General Counsel 600 Fifth Street, NW

Washington, DC 20001

Montgomery County, Maryland c/o County Executive Marc Elrich Executive Office Building 101 Monroe Street, 2nd Floor Rockville, MD 20850

Montgomery County Department of Correction and Rehabilitation c/o Office of the County Attorney

101 Monroe Street, 3rd Floor

Rockville, MD 20850

/s/ Jared Hester        Jared Hester